Matthew L. Johnson (6004)
Russell G. Gubler (10889)
Ashveen S. Dhillon (14189)
JOHNSON & GUBLER, P.C.
8831 West Sahara Avenue
Las Vegas, NV  89117
Telephone No. (702) 471-0065
Facsimile (702) 471-0075
mjohnson@mjohnsonlaw.com
*Proposed Attorneys for Debtor*

E-filed September 21, 2019

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>MMMT CORPORATION, dba Desert Hills Post-Acute & Rehabilitation Center<br><br>Debtor. | Bankruptcy Case No. 19-16113-mkn<br><br>Chapter 11<br><br>Date:<br>Time: |

**DECLARATION OF STEVEN R. PAVLOW IN SUPPORT OF EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING USE OF PURPORTED CASH COLLATERAL AND AFFORDING ADEQUATE PROTECTION, AND FOR AUTHORIZATION TO PAY CRITICAL VENDORS, PURSUANT TO SECTIONS 105, 361, 362 AND 363 OF THE BANKRUPTCY CODE AND RULE 4001(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND STATUS REPORT TO THE COURT REGARDIN HEALTH CARE PATIENT RECORDS PURSUANT TO SECTIONS  333 AND 351 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6011**

STEVEN R. PAVLOW states under penalty of perjury as follows:

1.   I am over eighteen years old and have personal knowledge of the facts in this declaration. I am competent to testify regarding these facts. I am the President of the Debtor, MMMT Corporation, dba

1  Desert Hills Post-Acute & Rehabilitation Center ("MMMT"). I have a Master's Degree in Health
2  Care Administration, and have been licensed as a nursing home administrator in California or Nevada
3  since approximately 1992.  I make this declaration in support of the Debtor's Emergency Motion for
4  Entry of Interim And Final Orders Authorizing Use of Purported Cash Collateral, and for
5  Authorization to pay Critical Vendors, as well as to provide the Court with a status regarding the fact
6  that I do not believe an ombudsman need be appointed in this health care bankruptcy case.
7  2.     MMMT is a Nevada corporation with its principal place of business in Las Vegas, Nevada.  The
8  Debtor was incorporated in 2014.  In approximately 2016, it began construction, through a related
9  entity, RCSRP Corporation, a Nevada Corporation, on an approximately 29,500 square foot building
10 located at 8225 W. Robindale Road.  The Debtor was incorporated to own and operate a skilled
11 nursing facility/physical rehabilitation facility consisting of approximately 75 beds located at 8225
12 W. Robindale Road in Las Vegas, Nevada.  Currently the Debtor is housing approximately 32
13 patients in need of rehabilitative and complex medical care.  Although the Debtor has the capacity to
14 operate 75 beds, and is licensed to do so, it has not had sufficient funds to staff enough medical care
15 personnel to care for more than 36 patients at this time.
16 3.     The Debtor employs various medical care providers such as registered nurses, licensed
17 practical nurses, certified nurse's aides, occupational therapists, physical therapists, and speech
18 therapists to assist in the care of the Debtor's patients.  In addition, credentialed physicians provide
19 the care plan and manage the care of each of the Debtor's patients.  The physicians are independent
20 practitioners, and they bill separately from the Debtor. The Debtor does not share in any of the
21 proceeds from the independent physician's billings, and does not charge the physicians for their
22
23
24

services. Furthermore, the Debtor's operations are overseen by the Nevada State Department of Health.

4. The Debtor leases its facility from a related company, RCSRP Corporation, which is also owned and operated by me. Recently, one of the creditors, Newport Consulting, and its principal, Steven Zanderholm, purportedly foreclosed on the real property, though the foreclosure appears to be invalid and is highly contested.[1]

5. In approximately October of 2016, the Debtor's sister company, RCSRP Corporation, received financing from Clearinghouse Community Development Financial Institution ("CDFI") to begin construction at the real property owned by RCSRP Corporation. In approximately November of 2017, CDFI provided additional financing to RCSRP, incorporating the original financing, and providing working capital for the Debtor. This loan was approximately $6,500,000.00 (the "Loan").

6. On information and belief, CDFI filed a UCC 1 Financing Statement, purportedly securing its interest in the Loan with not only RCSRP's real property, but with the cash and accounts of the Debtor.

7. On or about September 19, 2019, Newport Consulting obtained an eviction order from the Las Vegas Justice Court, which I understand will become effective on September 23, 2019 at 9:30 a.m.

---

[1] For example, the Clark County Recorder's records on the real property show that a Notice of Default and Election to Sell was recorded on March 4, 2018. That same day, a Notice of Rescission appears to have been recorded, making the validity of the very notice suspect. Furthermore, a Trustee Deed to Newport Consulting was recorded on June 28, 2019 as Instrument No. 201906280002566 with the Clark County Recorder. This Trustee Deed was recorded four (4) days before a foreclosure sale could even have been held, assuming that the March 4, 2018 Notice of Default was valid when there is also a Notice of Rescission recorded the same date. A new Trustee Deed is then recorded on July 2, 2018, the very first day a sale could have occurred under Nevada law, had the March 4, 2018 Notice of Default been valid. It is anticipated that these issues will be dealt with in another filing.

8. As a result, the Debtor sought Chapter 11 bankruptcy protection, to allow the Debtor to reorganize. Absent this filing, approximately 32 patients who are in need of complex medical care and rehabilitation would be evicted from the Debtor's facility with no plan for medical care or to where they would be transferred. Such act would have a devastating impact not only on these patients and their families, but would financially destroy the Debtor.

9. The Debtor has at least three or four critical vendors that supply x-ray, laboratory, pharmaceuticals, and contract services, including housekeeping, laundry, and food service, necessary for the ongoing concern of the Debtor's operation and to ensure the continued safety, welfare, and care of the patients at the Debtor's facility. Each of these essential services are required for the Debtor's continued licensing and operations.

10. The Debtor now seeks an emergency Order authorizing its use of purported cash collateral and to pay critical vendors, to avoid immediate and irreparable harm to the estate pending a final hearing on the matters. Due to the time limits in preparing and filing this case, I have not yet completed a proposed budget. However, I will do so, and the Debtor will submit a proposed and projected budget prior to a final hearing on this matter.

11. I understand the Debtor to be a health care business under the bankruptcy code. I do not believe, however, that it is necessary or appropriate for the Court to appoint an health care ombudsman in this case to monitor the quality of patient care as there are independent licensed physicians who bill separately and are not paid by the Debtor who come to the Debtor's facility to oversee and monitor all patient care that is provided at the Debtor's facility, and these physicians are charged with the care of each patient that is housed at the Debtor's facility. Further, if the Court allows the use of cash collateral, the Debtor has sufficient funds to pay for the storage of patient

1  records as all patient records are stored in electronic format and are available on the Debtor's
2  computer system. The Debtor is and will continue to protect the Debtor's patient privacy regarding
3  their medical conditions and medical records. I do not anticipate that there will be any situation
4  during this case in which patient care would be compromised or that would cause the Debtor to be
5  unable to pay for the storage of its patient records.
6  12.    As a going concern, I believe that the Debtor is worth far in excess of the secured debt, and that
7  there is sufficient equity to protect any creditor holding an interest in the Debtor's cash collateral.
8  Based on a business appraisal performed in 2017, the Debtor at stabilization (or approximately 92%
9  occupancy) would be valued at approximately $21,000,000.00.
10 13.    To the best of my belief, the following Creditors have an interest in Debtor's cash collateral:
11    a) CDFI
12    Furthermore, the following entities may purport to hold an interest in the Debtor's cash collateral.
13 My counsel and I attempted to obtain the information from the Nevada Secretary of State UCC
14 Search webpage, but I have been unable to confirm this as of the date of the filing:
15    a) Complete Business Solutions
16    b) Ascentium Capital
17    c) InvaCare
18    d) Newport Consulting
19    e) AAMG Finance
20 14.    Use of any purported cash collateral by the Debtor is anticipated to provide value to the
21 Debtor's estate and allow for successful reorganization as the Debtor anticipates that it will be able to
22 generate a profit. The Debtor will provide the Court with a budget shortly, showing the anticipated
23
24

1 profit after the payment of all expenses, salaries, taxes, and other costs.  Conversely, the inability of

2 the Debtor to use any cash collateral would cause immediate and irreparable harm to the estate. I

3 believe that no creditors would be paid other than a portion to possibly one secured creditor.

4     Stated under penalty of perjury this 21st day of September, 2019.

5     /s/ Steven E. Pavlow

6

7 Submitted by:

8

9 JOHNSON & GUBLER, P.C.

10  /s/ Matthew L. Johnson           .
Matthew L. Johnson (6004)

11 Lakes Business Park
8831 W. Sahara Avenue

12 Las Vegas, Nevada 89117
(702) 471-0065

13 (702) 471-0075 facsimile
e-mail: mjohnson@mjohnsonlaw.com

14
    (*Proposed)* Attorneys for Debtor MMMT Corporation

15

16

17

18

19

20

21

22

23

24